# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**TIFFANI ANN HILL**,

           Debtor.

Case No. **14-60302-7**

## MEMORANDUM OF DECISION

At Butte in said District this 4th day of December, 2014.

Pending in this Chapter 7 case is the Debtor Tiffani Ann Hill's ("Hill" or "Debtor") motion for sanctions (Document No. 15) against LPH, INC DBA Northwest Collectors (hereinafter "NWC") for willful violation of the automatic stay under 11 U.S.C. § 362(k)(1), for sending a collection report which included a scheduled debt of the Debtor to a credit reporting agency ("CRA") after the date of the filing of Debtor's bankruptcy petition. NWC filed an objection. A hearing on this contested motion was held after due notice at Great Falls on October 10, 2014. The parties were represented by counsel. Witness testimony was heard and exhibits were admitted. At the conclusion of the parties' cases-in-chief the Court granted the parties time to file briefs, and for Debtor's counsel to submit an affidavit of attorney's fees incurred. The briefs and Debtor's attorney affidavit have been filed and reviewed by the Court, together with the record and applicable law. This matter is ready for decision.

This Court has jurisdiction of this bankruptcy case under 28 U.S.C. § 1334(a). Debtor's motion for sanctions for violation of the automatic stay is a core proceeding under 28 U.S.C. § 157(b)(2). For the reasons set forth below, Debtor's motion for sanctions will be granted and sanctions awarded against NWC for its willful violation of the stay.

Hill appeared at the hearing on October 10, 2014, and testified, represented by attorney Randy L. Tarum ("Tarum") of Great Falls. NWC was represented by attorney Elizabeth A. Ries-Simpson of

1

Missoula, and NWC's president and majority shareholder Paul Heihn ("Heihn") testified, as did Sherry Jenkins.  Debtor's Exhibits ("Ex.") 1, 2, 3, 4, 6, 7, and NWC's Ex. 1, 2, 3, 4, 5, 6, and 7, were admitted into evidence.

## FACTS & PROCEDURAL HISTORY

Tiffany Hill is a mother with two young children who was divorced at the time she filed her bankruptcy petition.  Hill is self-employed at a nail salon she owns in Great Falls called "Tips by Tif" from which she earns most of her income, in addition to alimony/child support.  Hill testified that she has banked at Montana Federal Credit Union ("MFCU") since she was in high school.

Hill had a charge account agreement with Beaches Beauty Supply ("Beaches") of Missoula. NWC Ex. 2 shows the account and a statement giving a total amount Hill owed Beaches in the sum of $381.93.  Hill because delinquent on her Beaches account, and Beaches turned it over to NWC for collection.

NWC is a d/b/a of LPH, INC.  Paul Heihn is president and majority shareholder of LPH and has actively participated in the collection business for more than 5 years.  NWC's Ex. 1 is a "Collection Agency Agreement" with Beaches dated 2/12/03, whereby Beaches assigned its delinquent accounts to NWC for collection.  Ex. 1 includes an "Agency Liability" Article VI wherein NWC agrees to assume full liability for all claims or suits arising from NWC's means or methods of collection, and NWC agreed to indemnify and hold Beaches harmless from any claims or expenses incurred by NWC in collection. The Agreement does not request any information from Beaches about possible bankruptcy, but Heihn testified that NWC performs training sessions with its clients about bankruptcy.

 NWC has one office and seven employees.  Heihn testified that he is familiar with bankruptcy and the automatic stay, that NWC has attorneys on staff to help with bankruptcy matters, and that he trains and monitors NWC's employees in compliance with the Bankruptcy Code and federal credit reporting statute requirements.

2

Hill Ex. 6 is a copy of NWC's consumer bankruptcy policy and procedures.  Heihn testified that NWC relies on information it is given by clients, and that if NWC has any suggestion that there is a bankruptcy then it checks on the PACER system to verify whether an account is in bankruptcy.  On page 2 of Ex. 6 a NWC collector is directed to enter "PET" (petition for bankruptcy) in its Collect! Program and stop all collection activity, and the collector is changed to "MGR."

NWC uses a collection software system, identified at trial as "Metro 2," which holds all its credit reporting data and updates.  Once each month NWC sends its collection accounts, the total of which may approach a thousand accounts listed on its software system, in one massive file to the three CRAs.[1] Heihn testified the file holds a massive number of accounts and they are sent off in one file to the three CRAs.  He admitted that NWC is required by federal law to update collection accounts and report accurate information.  The information about Hill given to NWC by Beaches went into NWC's credit reporting software.

Because Hill was struggling to pay debts from an earlier marriage and divorce, she  decided to seek a fresh start through bankruptcy.  Hill filed her Chapter 7 petition on March 25, 2014, with her Schedules and Statement of Financial Affairs.  Schedule F lists Beaches as a creditor holding an unsecured nonpriority claim in the amount of $370.89 for business supplies.  NWC is not listed as a creditor in Debtor's Schedules.  Schedule F lists MFCU several times as a creditor holding unsecured nonpriority claims under several account numbers in the total amount of $208.00.[2]

The notice of commencement of the case, meeting of creditors, deadlines, and a warning to creditors not to collect a debt take certain actions or risk being penalized, was sent to creditors on March 27, 2014, including to Beaches in Great Falls.  The notice was not sent to NWC.  The notice (Document No. 4) tells creditors they "should not file a proof of claim at this time" unless they are sent another

---

[1]Transunion, Equifax and Experian.

[2]One claim is in the amount of $208.00.  The other MFCU claims all are for $0.

3

notice with a deadline to file a proof of claim.

The § 341 meeting of creditors was held on April 22, 2014.  The Trustee filed a no-asset report on April 25, 2014.

Notwithstanding Hill's bankruptcy, Jenkins testified that a week after the date Hill filed her bankruptcy petition Hill was able to obtain a $19,000 car loan from MFCU.  Hill decided to get married again, and planned for her wedding to take place on June 3, 2014.  She signed up for an online service, "Creditkarma.com," which enabled her to track her credit score and find out whenever any entity enquired about her credit.  Hill testified that she wanted to see if her debts in collection were taken off of her credit report when her bankruptcy appeared.

Debtor's Ex. 7 is a set of credit reports Hill obtained by logging into Creditkarma.com over a period of several months.  Ex. 7 shows Hill's bankruptcy on page 2, with the notation "Discharged."[3] On the third page Ex. 7 shows that Hill's credit rating was 655 as of April 28, 2014, which is described as "Fair."

After the § 341 meeting concluded, Hill testified, she thought that her bankruptcy was complete and that her fresh start had begun.  However, after the § 341 meeting Hill received a notice of collection of the debt listed in her bankruptcy schedules which she owed to Beaches.
NWC sent Hill one notice about the Beaches account, which Hill received on May 5, 2014.[4]  NWC Ex. 4.  The notice included $127.30 in post-petition collection fees.  NWC Ex. 3 shows that Hill's debt was listed on May 5, 2014.

Hill testified that the last thing she wanted was to be thrown back into collection.  Heihn testified that NWC made no active attempts to collect Hill's debt after May 6, 2014.  Hill called both Beaches and

---

[3]The Discharge of Debtor was entered on June 24, 2014.

[4]The date on NWC's notice had the wrong year, May 5, 2005, according to Debtor's Ex. 1.

NWC about the collection notice, and she reached someone at NWC in the morning of May 9, 2014. Debtor's Ex. 1, 2.  Heihn testified that Hill contacted NWC on May 9, 2014, but that she spoke with someone other than Heihn.

Hill informed NWC of her bankruptcy and that the debt for which NWC sent a collection notice was included in her bankruptcy.  Debtor's Ex. 1; NWC Ex. 3.  Hill gave NWC her bankruptcy case number.  Hill testified that the NWC employee she spoke to told her that the matter would be taken care of it.

Heihn testified that he himself verified Hill's bankruptcy filing on PACER, and as a result NWC suspended her account and stopped sending notices.  Heihn testified that, after Hill's phone call to NWC, he knew that Beaches had sent NWC an account which was subject to Hill's bankruptcy and, that if Beaches had informed NWC of her bankruptcy, NWC would have taken no action.  Heihn admitted that NWC should have taken every action to correct a violation of the automatic stay.

Heihn admitted that the automatic stay was in place on May 9, 2014.  He testified that NWC violated the automatic stay "several times" before it received notice of Hill's bankruptcy but that NWC took every step it could think of to remedy the violations and restore Hill's credit condition once it received notice of her bankruptcy.  One thing NWC did pursuant to its policies and procedures was modify its collection software entry to note that the Beaches account was included in Hill's bankruptcy. NWC entered a code in its collection software which stopped letters and phone calls to Hill.  It changed the collector name so that the original collector could not access Hill's account.  Notwithstanding these steps, Heihn testified that as of May 9, 2014, NWC knew that the information regarding Hill's account in its software system was not accurate.

Heihn testified that NWC has a duty under the federal credit reporting statutes and collection law to update debtors' accounts and protect consumers.  The problem with NWC's collection software, as Heihn explained it, is that the monthly account queue sent to the CRAs is a massive file, and Heihn

testified that he was unable to look at the monthly file and discern any information.

Hill's credit report as of May 12, 2014, reflected no adverse events.  On May 15, 2014, NWC's collection software system automatically sent the monthly file, including the Beaches account against Hill, to the three CRAs, including Transunion.  NWC Ex. 5.  Heihn testified that it is up to each CRA to decide what to do with the information, but he knew that the information possibly could show up on a debtor's credit report.

Heihn agreed under direct examination by Debtor's counsel that Hill's Beaches account should never have been in collections and he knew that NWC never should have taken any action against Hill.  Heihn repeated that this is the first time in six years that an account in bankruptcy had been given to NWC for collections and that NWC took every step that they could think of to remedy the violation.

Heihn testified that NWC, to his knowledge, is not able to stop the monthly file from being sent to the CRAs with Hill's account once it was entered into the queue, because federal credit reporting laws required that NWC update the other accounts in the queue each month.  Under questioning by the Court about whether NWC has the ability to override the entry of Hill's account in the monthly Metro 2 software before sending it to the CRAs, Heihn answered that NWC has the ability to correct and modify the data in subsequent reports, but the original entry remains in the queue even though that constitutes a violation of the stay.  He repeated that this is the first time this has happened to NWC and they still are trying to figure out how to correct such erroneous entries.  He testified that he imagines in the future that NWC will call its software supplier and the CRAs to make sure that information on bankruptcy debtors is not included in monthly reports.

Hill testified that she received a notice from Creditkarma on May 19, 2014, informing her that her credit score had dropped by 14 points because of the Beaches account placed into collection by NWC.  Debtor's Ex. 3 reflects a 14 point drop in her credit rating at Transunion, as a result of the account in the amount of $510 placed into collections by NWC.  Hill testified that the $510 amount on

Ex. 3 includes charges imposed by NWC after she filed her bankruptcy petition.

This negative reporting action took place two weeks before Hill's wedding day.  She testified that she was "horrified" and that it was the last thing that she needed because the collections would show up on her credit report where banks would see it.  She testified that she felt stressed, "lost it" a couple of times and was "a wreck" because she had been looking forward to her wedding, but instead she was back in collections.  She did not seek medical treatment for her stress.

The Court reopened the record to allow Hill to testify about her actual damages and emotional distress.  She testified that she missed work attempting to contact NWC about the collection notice, and she missed work for the day of trial.  However, she testified that she worked extra hours and long days to make up for her lost work.  No evidence exists in the record of any lost earnings or costs incurred by Hill as a result of NWC's collection notice.

Hill testified that she called her attorney Tarum about the appearance of the Beaches account on her credit report on May 19, 2014.  Heihn testified that no one spurred NWC to act, but that it took a few days for NWC to request that the CRAs remove Hill's account using a program named "e-OSCAR" on May 19, 2014.  Heihn testified that e-OSCAR is a website owned by Transunion, which permits transmission of information on individuals to resolve credit disputes.  He testified that e-OSCAR was NWC's only means to get individual information to Transunion and that NWC could not have used e-OSCAR to remove the Beaches account prior to May 15, 2014, because no information existed on the credit report.

Heihn testified that NWC requested that the CRAs remove Hill's account from the credit report on May 19, 2014, and her account was removed on May 20, 2014.  NWC Ex. 3, 6, and 7 state that Hill's account was "removed from credit" on May 20, 2014, using e-OSCAR.[5]  The e-OSCAR request deleted Hill's Beaches account from the credit reports of the CRAs –  Transunion, Equifax and Experian –  and

_____

[5]Debtor's Ex. 1 mistakenly lists the date as May 20, 2015.

the account was closed on May 21, 2014.  Hill Ex. 1, para. 9.

The Trustee filed a no-asset report; no notice was sent to creditors to file proofs of claim.

Nevertheless, on May 22, 2014, NWC filed Proof of Claim No. 1 for the Beaches account asserting a

claim in the total amount of $510.69, including $381.93 principal, interest and a $127.30 collection fee.

Heihn signed Proof of Claim No. 1 on May 16, 2014, and the $127.30 collection fee has a posted date of

May 5, 2014.  Heihn testified that he believes NWC was owed the collection fee on the date it was

entered, but that NWC made no attempt to collect it.  He admitted that Hill did not owe the $127.30

collection fee on the date she filed her bankruptcy petition.

Heihn testified that NWC's computer allows it to fix errors such as the mistaken proof of claim

amount.  When asked why NWC did not correct its claim amount, Heihn answered that it took alternate

steps to make sure the consumer was not contacted, and made no further efforts at collection.

Hill's wedding took place, and she testified that the day after her wedding she went to MFCU

and applied for a loan to cover extra costs from the wedding.  Earlier, Hill was able to get a car loan from

MFCU in the amount of approximately $19,000, and she testified that MFCU had no problem with her

bankruptcy at that time.  When she applied for a $1,000 loan after her wedding on June 4, 2014, however,

MFCU turned her down.

Sherry Jenkins is an employee at MFCU.  She testified that MFCU would not rely on a credit

score put out by Creditkarma in deciding whether to loan money, but it would refer to a credit score

generated by one of the CRAs[6] and would consider its relationship with the loan applicant and the

applicant's ability to repay in making a decision whether to loan money.  According to Jenkins, MFCU

and most lenders would not approve an unsecured loan in an open bankruptcy case.

Hill testified that the NWC debt was still shown as in collections as of June 2014 on her credit

report.  However, Debtor's Ex. 7 shows that her credit rating on June 4, 2014, was 684, which reflected a

---

[6]On cross examination Jenkins admitted that Creditkarma uses Transunion's credit score.

43 point rise from the rating dated May 19, 2014.  Hill testified that the rise in her credit score happened because the debt placed into collections by NWC the month before was removed by June 4, 2014.  On cross examination, Hill admitted that as of June 4, 2014, no collections appeared on her credit report.[7]

Hill testified that she understood MFCU refused her the $1,000 loan because of the debt which NWC had placed into collections, even through she told MFCU that the NWC debt should not have been placed in collections.  She testified that MFCU's denial of the $1,000 loan caused her extra stress that she didn't need.  Jenkins testified that an unsecured loan involves more risk than a secured loan.

A discharge of Debtor was entered on June 24, 2014.  On June 26, 2014, Hill filed her motion for sanctions against NWC and Beaches[8] for willful violation of the automatic stay.  The motion seeks actual damages for the drop in her credit rating, mental and emotional distress, loss of borrowing ability, plus punitive damages and attorney fees.

Debtor's attorney Tarum submitted his affidavit of fees for services related to the stay violation, with dates, a description of services, and separate columns for services relating to Beaches, NWC and both.  The only entry prior to May 20, 2014, when NWC had Hill's account removed utilizing e-OSCAR, is an entry dated 5/19/14 which lists 1 hour for a meeting with the client and .25 hours reviewing credit report information.  Tarum's billing rate is $250 per hour. The May 19 entries are allocated to NWC and Beaches together and total $312.50.

Tarum's other entries ranged from drafting a settlement letter on 5/28/2014, through 10/24/14 in preparing Hill's post-trial brief.  The total fees allocated to NWC according to Tarum's affidavit are stated alternatively as $8,245.25 and $8,325, and costs attributable to NWC total $12.75.

---

[7]She did not know what time on June 4, 2014, the credit report was generated compared with when she applied for the unsecured loan at MFCU.

[8]Hill reached a resolution of her motion for sanctions with Beaches, which is not part of this decision.  No written settlement documents with Beaches have been filed in this case.

NWC filed an objection to Debtor's motion for sanctions contending that its collection notice of May 5, 2014, occurred before it had notice of her bankruptcy and that NWC's sending of her account to the CRAs on May 15, 2014, occurred by pre-scheduled automation, which NWC updated to delete her account by May 20, 2014.  With respect to NWC's collection charges on its Proof of Claim, NWC objected that it never attempted to collect them and they were discharged.  NWC objected to an award of attorney fees under *Sternberg v. Johnston*, 595 F.3d 937, 948 (9th Cir. 2010), *cert. denied*, 131 S.Ct. 102, 178 L.Ed.2d 29 (2010), because the stay violation had ended before Debtor filed her motion for sanctions and that she filed her motion solely to seek damages for past violations.

## DISCUSSION

The Debtor's filing of her bankruptcy petition on March 25, 2014, gave rise to an "automatic stay."  11 U.S.C. § 362(a).  The Ninth Circuit has repeatedly described the broad scope of the automatic stay as "one of the most important protections in bankruptcy law."  *Sternberg v. Johnston*, 595 F.3d at 943, quoting *Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210, 1214-15 (9th Cir. 2002); *Hillis Motors, Inc. v. Haw. Auto Dealers' Assoc.*, 997 F.2d 581, 585 (9th Cir. 1993).  The Ninth Circuit construed the automatic stay in *In re Gruntz*, 202 F.3d 1074, 1081-82 (9th Cir. 2000):

> The automatic stay is self-executing, effective upon the filing of the bankruptcy petition. *See* 11 U.S.C. § 362(a); *The Minoco Group of Companies v. First State Underwriters Agency of New England Reinsurance Corp.* (*In re The Minoco Group of Companies*), 799 F.2d 517, 520 (9th Cir.1986).  The automatic stay sweeps broadly, enjoining the commencement or continuation of any judicial, administrative, or other proceedings against the debtor, enforcement of prior judgments, perfection of liens, and "any act to collect, assess or recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. § 362(a)(6).

> Section 362(k)[9] in effect in this case provides:

> [A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages.

---

[9]Section 362(h) was amended and redesignated to § 362(k) by enactment of BAPCPA in 2005.

10

*In re Snowden*, 769 F.3d 651, 658 (9th Cir. 2014); *Leetien, P.C., v. Roman (In re Roman)*, 283 B.R. 1, 9 (9th Cir. BAP 2002).

The long-standing rule followed by this and other courts is that a violation of the stay is willful if (1) the creditor knew of the stay and (2) the creditor's actions which violated the stay were intentional. *Roman,* 283 B.R. at 8; *Leetien & Adler*, 309 F.3d at 1215; *In re Reece*, 15 Mont. B.R. 474, 477-78 (Bankr. D. Mont. 1996), citing *In re Lile*, 103 B.R. 830, 836, 841 (Bankr.S.D.Tex.1989). In *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1191 (9th Cir. 2003), the Ninth Circuit noted that § 362(k) provides for damages for willful violation of the stay upon a finding that the defendant knew of the automatic stay and that the defendant's actions, which violated the stay, were willful. *See also Havelock v. Taxel (In re Pace)*, 67 F.3d 187, 191 (9th Cir. 1995) (cited in *Roman*, 283 B.R. at 12-13).

A party with knowledge of bankruptcy proceedings is charged with knowledge of the automatic stay. *Dyer*, 322 F.3d at 1191, *citing Pinckstaff v. United States*, 974 F.2d 113, 115 (9th Cir. 1992). Further, "once a creditor or actor learns or is put on notice of a bankruptcy filing, any actions intentionally taken thereafter are 'willful' within the contemplation of § 362([k])." *Risner*, 317 B.R. at 835, citing *Leetien & Adler*, 309 F.3d at 1215; *In re Forty-Five Fifty-Five, Inc.*, 111 B.R. 920, 923 (Bankr. D. Mont. 1990).

Given the broad, self-executing, automatic stay described above, the Court finds and concludes that NWC willfully violated the automatic stay. Heihn testified that his company NWC violated the stay numerous times; his testimony is corroborated by Hill's testimony and NWC's own Ex. 3 and 5, which show the monthly credit account queue was sent to the CRAs on May 15, 2014, including Hill's account owed to Beaches for a pre-petition debt, after Hill contacted NWC on May 9, 2014, and informed NWC that the debt was included in her bankruptcy.

NWC had an affirmative duty to conform its conduct to the automatic stay once Hill filed for bankruptcy. *Sternberg*, 595 F.3d at 943, 944; *Del Mission Ltd.*, 98 F.3d at 1151-52  This duty means that

NWC needed to do what it could to remedy the violation. *Sternberg*, 595 F.3d at 945. Heihn testified several times that NWC did everything they could think of to correct the violation, but the evidence does not support that. NWC's Ex. 3 shows that Hill told it of her bankruptcy on May 9, 2014, but the account queue was sent to the CRAs six days later.

Heihn testified that NWC could not remove Hill's account from the queue because its computer software would not allow it. NWC's affirmative duty is to conform to the stay, not merely to try to conform. *Sternberg*, 595 F.3d at 943. NWC's contention that its computer collections software does not permit deleting data, or editing data from the queue, strains belief. But believable or not, NWC's transmission of Hill's account to the CRAs was a willful violation of the stay.

NWC's blaming of its internal computer system for its violation of the stay lacks merit. *See, e.g., Eskanos*, 309 F.3d at 1215. NWC is a corporation in the business of collections. Corporations are expected to have in place procedures to ensure that they comply with all areas of the law. *In re Perviz*, 302 B.R. 357, 367 (Bankr. N.D. Ohio 2003). In this Court's view that means that NWC has an affirmative duty to ensure that its internal computer systems comply with the automatic stay. NWC failed that duty when it sent the account queue including Hill's account to the CRAs on May 15, 2014, where it appeared on her credit report.

Such actions taken in violation of the automatic stay are void, not merely voidable. *Gruntz*, 292 F.3d at 1082; *40235 Wash. St. Corp. v. Lusardi*, 329 F.3d 1076, 1082 (9th Cir. 2003); *Schwartz v. United States*, 954 F.2d 569, 570-71, 575 (9th Cir.1992); *In re Deines*, 17 Mont. B.R. 114, 115 (Bankr. D. Mont. 1998); *Hillis Motors, Inc.*, 997 F.2d at 586. Just as NWC's action of May 15, 2014, when its computer system automatically forwarded the account queue for Hill's account to the CRAs, was a violation of the stay and therefore void, so too is NWC's post-petition collection fee in the amount of $127.30 included in its Proof of Claim void. The fee was imposed in the collection of a pre-petition debt, Hill Ex. 4, and therefore is a collection action subject to the stay.

A creditor who attempts collection of prepetition debt after it knows of the debtor's bankruptcy is subject to sanctions for willful violation of the automatic stay. *Del Mission Ltd.*, 98 F.3d at 1151; *see In re Goodman*, 991 F.2d 613 (9ᵗʰ Cir.1993). The postpetition collection actions initiated by the creditor in *Leetien* were in plain violation of the stay and void, and subject to sanctions. The bankruptcy court imposed sanctions for willful violations of the stay, and the district court and Ninth Circuit affirmed. *Leetien,* 309 F.3d at 1212. Concluding, the Ninth Circuit wrote:

> We conclude that § 362(a) imposes an affirmative duty to discontinue post-petition collections actions. Sanctions are appropriate pursuant to § 362(h) because Eskanos willfully violated the automatic stay by maintaining the active collection action and unjustifiably delaying its dismissal after receiving notice of the bankruptcy petition.

*Leetien*, 309 F.3d at 1216; *see, Sternberg*, 595 F.3d at 943.

The Ninth Circuit quoted above noted that the creditor willfully violated the stay by maintaining an active collection action "and unjustifiably delaying its dismissal" after receiving notice of the stay. *Leetien*, 309 F.3d at 1216. *In re Forty-Five Fifty-Five, Inc.*, 111 B.R. at 923 explains that "when a party acts with knowledge of a pending bankruptcy, a violation of the stay is considered willful and damages must be assessed." *Lile*, 103 B.R. at 836. An innocent stay violation can become willful if the creditor fails to remedy the violation after receiving notice of the stay. *Del Mission Ltd.*, 98 F.3d at 1151; *Abrams v. Sw. Leasing and Rental Inc.*, 127 B.R. 239, 241-44 (9ᵗʰ Cir. BAP 1991).     NWC argues that its violation happened unintentionally and that NWC deleted Hill's account from credit reporting one day after it appeared on her credit report. NWC's actions on May 15, 2014, were willful violations of the stay because its computer system sent Hill's account to the CRAs with knowledge of her bankruptcy. *Eskanos & Adler*, 309 F.3d at 1214-15; *Dyer*, 322 F.3d at 1191; *Roman*, 283 B.R. at 8; *Risner*, 317 B.R. at 835; *Reece*,15 Mont. B.R. at 477-78.

NWC argues that the Debtor failed to offer any evidence of actual damages which can be awarded. With respect to lost income and out-of-pocket costs, the Court agrees that Hill offered no

13

evidence of such actual damages.  The Court reopened the record and gave Hill the opportunity to testify about lost income, but she testified that she took on additional work to make up for lost income, and she offered no evidence upon which the Court could quantify an award for lost income or out-of-pocket costs.

**Emotional Distress Damages**.

Hill argues that she is entitled to damages for emotional distress and disruption of life, and that her emotional distress is similar to the debtor in *Snowden* who was awarded $12,000 for emotional distress because of testimony that she panicked, was out of her mind with worry, could not concentrate and felt miserable.  Hill contends that she suffered emotional distress when she learned that NWC reported her debt to the CRAs after promising her that it would take care of it, at a very stressful time for her as a self-employed mother of two young children preparing for her wedding.

NWC opposes an award for emotional distress arguing that it is not supported by the evidence and argues that Hill is using the stay statute as a sword rather than a shield to achieve a windfall.

Emotional distress damages are permitted under § 362(k) if the debtor "(1) suffer[s] significant harm, (2) clearly establish[es] a causal connection between that significant harm and the violation of the automatic stay (as distinct, for instance, from the anxiety and pressures inherent in the bankruptcy process)."  *Snowden*, 769 F.3d at 656-57, quoting *In re Dawson*, 309 F.3d 1139, 1149 (9th Cir. 2004).  In *Snowden* the Ninth Circuit affirmed an award of emotional damages, finding the debtor credible and that she clearly established that she suffered significant emotional harm as a result of the creditor cashing a check, which upended the debtor's finances and efforts to manage her affairs, continuing to call her post-petition and refusal to rectify the situation it created.

In the instant case the evidence shows that Hill was looking forward to her fresh start after her § 341 meeting, but that expectation was ruined when NWC sent her a collection notice for the Beaches debt.  She contacted NWC and informed it that the Beaches debt was included in its bankruptcy.  NWC

14

told her that it would take care of it.  NWC failed to take care of it, and instead allowed Hill's account to
be sent the CRAs and placed on her credit report, where it effected a significant reduction of her credit
score.

Hill testified that she was a wreck, lost it a few times, and that it caused her stress at a time when
she was preparing for her upcoming wedding.  The Court observed Hill's demeanor closely while
testifying under oath and cross-examination and the Court finds that Hill is credible.  The Court finds and
concludes that Hill satisfied her burden of clearly establishing that she suffered significant harm and she
demonstrated a causal connection between that significant harm and NWC's violation of the automatic
stay, as required by *Snowden* and *Dawson.*  769 F.3d at 657.

Hill did not seek medical attention for the stress, but the Court nevertheless finds that she
suffered significant harm.  The Court finds that the emotion distress Hill suffered as a result of NWC's
violation of the stay is distinct from the pressures inherent in the bankruptcy process.  Hill was prepared
for and weathered the bankruptcy process, and after performing her duties as a debtor, she anticipated the
benefits of her fresh start.  NWC's violations of the stay deprived her of her fresh start, and instead
caused her unnecessary, unwarranted stress, particularly after NWC told her that it would take care of it,
and caused adverse effects to her credit score.  Even if a violation of the stay is not egregious, a debtor
may recover emotional distress damages that arose from a stay violation, and a debtor may establish
emotional distress damages without corroborating evidence if the circumstances make it obvious "that a
reasonable person would [have suffer[ed] significant emotional harm."  *Sternberg*, 595 F.3d at 943 n.1,
quoting *Dawson*, 309 F.3d at 1149-51.  In this Court's view the circumstances in the instant case, where
NWC sent Hill's account to the CRAs after telling her that it would take care of it, make it obvious that a
reasonable person would have suffered significant emotional harm.

The Court does not find significant harm from MFCU's denial of Hill's application for an
unsecured loan.  The evidence shows that MFCU's decision could be attributable to her bankruptcy case

15

and discharge of MFCU's unsecured claim.

The emotional distress awarded in *Snowden* amounted to $12,000.  769 F.3d at 655.  There, the offending creditor used an electronic funds transfer to overdraw the debtor's bank account and made a series of harassing phone calls to the debtor at the hospital where she worked, causing her panic and making her "out of her mind."  In the instant case, by contrast, the Court finds that the evidence of emotional distress warrants a smaller award.  Hill testified that as a result of NWC's stay violation she was a wreck, lost it a few times, and that it caused her stress at a time when she was preparing for her wedding.  The emotional damages caused by NWC's stay violation were less severe than the evidence of emotional damages shown in *Snowden* and NWC cured its only willful stay violation within 5 or 6 days when it used e-OSCAR to remove her account from the CRAs.

Hill demonstrated that she is resilient, and disciplined.  She endured the emotional stress caused by NWC, got married and came through with her business and wedding intact.  After consideration of the record, the Court awards Hill the sum of $300 for emotional distress damages under § 362(k).  *See Snowden,* 769 F.3d at 656-57; *Dawson*, 390 F.3d at 1149.

### Punitive Damages.

Hill argues that an award of punitive damages against NWC is appropriate because of its "corporate arrogance" and reckless disregard for the law or her rights.  She contends that NWC's failure to configure its computer software system to prevent violations of the stay by sending the monthly queue to the CRAs with accounts subject to bankruptcy exemplifies reckless and callous disregard for the automatic stay and rights of others and that punitive damages are necessary to provide incentives for NWC and other collection agencies which use the same system to fix their systems.

NWC opposes any punitive damages because the violation was fixed nearly five months prior to the hearing when NWC accessed e-OSCAR to remove Hill's account from her credit report.  NWC argues that the hypothetical thousands of other potential violations referred to by Hill in her brief are

irrelevant.

Section 362(k) provides for punitive damages "in appropriate circumstances." *Snowden*, 769

F.3d at 657. "An award of punitive damages requires "some showing of reckless or careless disregard for

the law or rights of others." *Id.,* quoting *In re Bloom*, 875 F.2d 224, 228 (9th Cir. 1989). In *Snowden* the

Ninth Circuit affirmed an award of punitive damages in the amount of $12,000 based on evidence that

the creditor failed to provide a policy or employee training about how to address debt collection

following a bankruptcy. *Snowden*, 769 F.3d at 657-58.

In the instant case the Debtor's own Ex. 6 is NWC's printed "Policy and Procedure" with the

subtitle "Consumer Bankruptcy." Thus, the evidence does not show as much reckless or callous

disregard for the law or rights of others by NWC as shown in *Snowden*. In addition, NWC accessed E-

OSCAR to remove Hill's account from her credit report within five days of sending it into the CRAs.

On the other hand, Hill's account should not have been sent to the CRAs at all on May 15, 2014,

particularly after NWC told Hill that it would take care of it. That this violation happened contrary to

NWC's bankruptcy policies and representations to Hill, in this Court's view constitutes a sufficient

showing of reckless or callous disregard for the law or rights of others, and appropriate circumstances to

warrant an award of punitive damages under § 362(k).

Heihn's testimony that this is the first time this has ever happened and that NWC did everything

it could think of to remedy the violation is unpersuasive. Hill's account should have been removed from

the monthly account queue, and should not have been sent to the CRAs on May 15, 2014. If NWC's

computer system did not allow editing or deletion of Hill's individual account, then NWC should have

deleted the entire file and started over compiling the queue from scratch and omitting Hill's account.

Hill informed NWC of her bankruptcy on May 9, 2014, giving  NWC six days to reconstitute the queue

without her account.

Almost five months later, at the hearing on October 10, 2014, Heihn testified that NWC's

17

computer system still does not give it the ability to remove an account in bankruptcy such as Hill's. This suggests that NWC is simply paying lip service to its own policies as well as the automatic stay. NWC is in the business of collections, and its failure to affirmatively conform its computer system to prevent violations of the stay, along with and balanced by the other evidence discussed above, persuade the Court to award Hill limited punitive damages in the amount of $300 for NWC's reckless or callous disregard for the bankruptcy stay and Hill's rights. *Snowden*, 769 F.3d at 657.

**Attorney's Fees.**

The BAP in *Roman* cited Congress' intent that an award of attorney's fees and costs is mandatory upon a finding of a willful violation of the stay. *Id.*, 283 B.R. at 7, 9-10; *Beard v. Walsh (In re Walsh)*, 219 B.R. 873, 876, 879 (9th Cir. BAP 1998); *Ramirez v. Fuselier (In re Ramirez)*, 183 B.R. 583, 589 (9th Cir. BAP 1995). However, the Ninth Circuit in *Sternberg* concluded that attorney fees incurred in prosecuting a damages action for a stay violation, where the stay violation has been cured, is akin to an ordinary damages action for which attorney fees are not available under the American Rule. 595 F.3d at 948 ("We have never said that the stay should aid the debtor in pursuing his creditors. The stay is a shield, not a sword. *See, e.g.* [*Hillis Motors, Inc.*, 997 F.2d at 585] ").

Hill requests $8,337.75 in attorney fees and costs against NWC for its willful violation of the stay. She contends that NWC denied that it violated the automatic stay until Heihn admitted at trial that NWC violated the stay numerous times. Further, she argues that NWC did not offer to pay Hill her actual damages, and has not fixed its computer system or bankruptcy policy to prevent future violations of the stay.

NWC contends that it was defending itself against Hill's exorbitant demands for attorney fees, and that its stay violation ended on May 20, 2014, so no fees are recoverable under the American Rule. NWC argues that it should be held liable only for fifty percent of Tarum's fees on May 19, 2014, or $156.25, and perhaps $31.25 for drafting the settlement letter on May 28, 2014.

The Court notes that the BAP has observed that "fee shifting statutes, like § 362([k]) have given debtors an opportunity to use the statute as a sword rather than a shield against creditors, to courts' dismay[,]" and "that rewarding debtors too lavishly in § 362([k]) actions will encourage a cottage industry of precipitous § 362([k]) litigation[.]" *Roman*, 283 B.R. at 11, quoting *McLaughlin v. Fireman's Trust Mortg. Corp. (In re McLaughlin)*, 96 B.R. 554, 560 (Bankr. E.D. Pa. 1989).

Under *Roman* the Court must examine whether the Debtor could have mitigated her damages and in determining the appropriate amount of attorney's fees to award courts look "to two factors:  (1) What expenses or costs resulted from the violation; and (2) what portion of those costs was reasonable, as opposed to costs that could have been mitigated." *Roman*, 283 B.R. at 12, quoting *In re GeneSys, Inc.,* 273 B.R. 290, 296 (Bankr. D.C. 2001) (other citations omitted).

Hill submits that the proper date for awarding attorney fees is when the Court issues its Order determining as a matter of law that NWC willfully violated the stay.  That is not the law in this circuit. In *Snowden* the Ninth Circuit explained:  "*Sternberg* established a bright-line rule that attorneys' fees incurred in an attempt to collect damages *once the stay violation has ended* are not recoverable." 769 F.3d at 658, quoting *Sternberg*, 595 F.3d at 948.  The evidence at the hearing showed and the Court finds that NWC ended its stay violation on May 20, 2014, when it accessed e-OSCAR the day before and asked the CRAs to remove Hill's account.  It was removed from her credit report and her credit score improved.  Thus, under *Sternberg* and *Snowden*, Hill's attorney's fees incurred attempting to collect damages from NWC after May 20, 2014, are not recoverable.

The facts in this case are distinguishable from the facts in *Snowden* and *In re Schwartz-Tallard*, 765 F.3d 1096 (9th Cir. 2014).  In *Snowden* the creditor failed its affirmative duty to return any property which it had wrongfully seized from the estate, but instead responded to an offer to settle with an email containing implied conditions and Snowden had to go to court to end the stay violation.  769 F.3d at 659.  In  *Schwartz-Tallard* the court awarded the debtor attorney fees because she was forced to

19

defend a creditor's appeal of the bankruptcy court's ruling that the creditor violated the stay. 765 F.3d at 1100. In the instant case, by contrast, although NWC opposed Debtor's motion the evidence shows that NWC ended the stay violation when it used e-OSCAR to remove Hill's account from her credit report. Heihn admitted the stay violation in his testimony, so an appeal of that finding is unlikely.

Tarum's affidavit shows $312.50 worth of attorney's fees incurred on May 19, 2014, meeting with Hill regarding NWC's stay violations and reviewing the credit report information. NWC argues that since Tarum allocated those fees against both Beaches and NWC, it should only be held liable for one-half of those fees. The Court disagrees. Beaches is no longer a party in this contested matter. NWC is the one which sent Hill's account to the CRAs in willful violation of the stay. The stay violation was not ended until May 20, 2014, when Hill's Beaches account was removed from her credit report. Accordingly, the Court awards Hill attorney's fees in the amount of $312.50 incurred on May 19, 2014, related to remedying NWC's stay violation under § 362(k). *Snowden*, 769 F.3d at 660; *Sternberg*, 595 F.3d at 940.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this Chapter 11 case under 28 U.S.C. § 1334(a).

2. Hill's motion for sanctions against NWC for willful violation of the automatic stay is a core proceeding under 28 U.S.C. § 157(b)(2).

3. Hill satisfied her burden of proof to show by a preponderance of the evidence that NWC willfully violated the automatic stay by transmitting her Beaches account to the CRAs on May 15, 2014, while knowing of the automatic stay.

4. Hill satisfied her burden to show that she suffered significant harm and clearly established a causal connection between that significant harm and NWC's violation of the automatic stay, distinct from the anxiety and pressures inherent in the bankruptcy process. *Snowden*, 769 F.3d at 656-57; *Dawson*, 309 F.3d at 1149. The Court awards Hill emotional distress damages against NWC in the amount of

20

$300.

  5. Hill satisfied her burden to show reckless or careless disregard by NWC for the automatic stay and Hill's rights.  The Court awards Hill punitive damages against NWC in the amount of $300.

  6. Hill is awarded attorney's fees related to remedying NWC's stay violation through May 19, 2014, in the total amount of $312.50.

  **IT IS ORDERED** a separate Order shall be entered in conformity with the above overruling NWC's objection and granting Hill's motion for sanctions against NWC for willful violation of the automatic stay; and:  (1) disallowing as void NWC's claim for post-petition collection charges in the amount of $127.30; (2) awarding Hill $300 in emotional distress damages against NWC under § 362(k); (3) awarding Hill $300 in punitive damages against NWC under § 362(k); and (4) awarding Hill $312.50 in attorney's fees against NWC under § 362(k).

         BY THE COURT

         *Ralph B Kirscher*

         HON. RALPH B. KIRSCHER
         U.S. Bankruptcy Judge
         United States Bankruptcy Court
         District of Montana